*In The*

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

## v.

## DAREN KAREEM GADSDEN, a/k/a D,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## AT BALTIMORE

_____

## BRIEF OF APPELLANT

_____

Steven H. Levin
Sarah F. Lacey
LEVIN & CURLETT LLC
201 North Charles Street
Baltimore, Maryland 21201
(410) 685-0078

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................iv

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE...................................................................................2

SUMMARY OF THE ARGUMENT ........................................................................8

ARGUMENT ...............................................................................................................10

    I.    Because the government required itself to prove that both PNC and Bank of America were victims of the scheme to defraud, but failed to meet its burden, the verdict as to Counts 1-11 must be vacated .........................................................................................10

        Standard of Review .........................................................................10

        A.    The jury instructions were modified at the government's request to mandate a conjunctive reading of the phrase "PNC Bank and Bank of America" by pluralizing "banks" and "financial institutions," and its choice must be enforced on appeal ................................................11

        B.    The government failed to produce evidence that Bank of America was an actual or intended victim of bank fraud .........15

    II.    In the alternative, because the government required itself to prove that the conspirators obtained HABC's funds by means of misrepresentations to both PNC and Bank of America, but failed to meet its burden, the verdict as to Counts 1-11 must be vacated ................................................................................22

        Standard of Review .........................................................................22

i

A.    This Court should not retroactively apply the new substantive rule of *Loughrin v. United States* because that rule unexpectedly broadens the scope of § 1344(2) by eliminating the intended victim requirement previously applied in this Circuit ............................................................22

B.    Even if this Court does retroactively apply *Loughrin*, the government was required to prove that both PNC and Bank of America were induced to release HABC's funds "by means of" misrepresentations — but it failed to produce sufficient evidence as to Bank of America .................24

III.    The evidence was insufficient to find that the deletion of two email accounts impaired the integrity or availability of any record, document, or other object for use in an official proceeding and to find that Mr. Gadsden was responsible for their deletion ..........................................................................31

Standard of Review ................................................................31

A.    The government failed to show that the email accounts contained any "record, document, or other object" or that the email accounts themselves were "record[s], document[s], or other object[s]" ...............................31

B.    The evidence purporting to establish that it was Mr. Gadsden who deleted the accounts was insufficient to find this fact beyond a reasonable doubt ...................................36

IV.    Because the district court imposed an unreasonable sentence based on the erroneous application of four adjustments in calculating Mr. Gadsden's total offense level under the Guidelines, in the event his conviction is not vacated, this case should be remanded to the district court for resentencing ..................38

Standard of Review ................................................................38

Argument ..............................................................................39

A.    The district court's application of the enhancement for allegedly making a misrepresentation to "obtain a benefit on behalf of" HABC was clearly erroneous ............................40

B.    The government failed to show that Mr. Gadsden used sophisticated means beyond the concealment inherent in bank fraud ................................................................................41

C.    The government failed to show that Mr. Gadsden individually derived more than $1,000,000 in gross receipts as a result of the fraud on HABC ................................43

D.    The district court's application of the enhancement for obstruction of justice was clearly erroneous............................46

CONCLUSION ........................................................................................47

STATEMENT REGARDING ORAL ARGUMENT ............................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bouie v. City of Columbia*,
    378 U.S. 347 (1964)......................................................................................23

*Bousley v. United States*,
    523 U.S. 614 (1998)......................................................................................23

*Bradford Trust Co. v. Texas American Bank-Houston*,
    790 F.2d 407 (5th Cir. 1986) ..............................................................16, 17

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*,
    CIV. 09-2751, 2010 WL 4224473 (E.D. Pa. Oct. 22, 2010)..................20, 29

*Gall v. United States*,
    552 U.S. 38 (2007)........................................................................................38

*Glasser v. United States*,
    315 U.S. 60 (1942)........................................................................................11

*Griffith v. Kentucky*,
    479 U.S. 314 (1987)......................................................................................22

*Loughrin v. United States*,
    134 S. Ct. 2384 (2014)..........................................................................*passim*

*Neder v. United States*,
    527 U.S. 1 (1999)....................................................................................24, 25

*Schriro v. Summerlin*,
    542 U.S. 348 (2004)................................................................................22, 23

*United States v. Achiekwelu*,
    112 F.3d 747 (4th Cir. 1997) ......................................................................40

*United States v. Adepoju*,
756 F.3d 250 (4th Cir. 2014) .................................................................*passim*

*United States v. Beidler*,
110 F.3d 1064 (4th Cir. 1997) ...........................................................11

*United States v. Blackmon*,
839 F.2d 900 (2d Cir. 1988) ..............................................................13

*United States v. Brandon*,
298 F.3d 307 (4th Cir. 2002) ...............................................12, 13, 23

*United States v. Briggs*,
965 F.2d 10 (5th Cir. 1992) ................................................................29

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996) ...............................................................11

*United States v. Celesia*,
945 F.2d 756 (4th Cir. 1991) .............................................................12

*United States v. Cobler*,
748 F.3d 570 (4th Cir. 2014) .............................................................38

*United States v. Colton*,
231 F.3d 890 (4th Cir. 2000) ...............................................13, 24, 44

*United States v. Daughtrey*,
874 F.2d 213 (4th Cir. 1989) .............................................................39

*United States v. Dugger*,
485 F.3d 236 (4th Cir. 2007) .........................................................38-39

*United States v. Edelkind*,
467 F.3d 791 (1st Cir. 2006)..............................................................45

*United States v. Frazier*,
53 F.3d 1105 (10th Cir. 1995) ..........................................................40

*United States v. Gaudin*,
    515 U.S. 506 (1995)................................................................24

*United States v. Green*,
    436 F.3d 449 (4th Cir. 2006) .......................................................38

*United States v. Hickman*,
    626 F.3d 756 (4th Cir. 2010) ..................................... 21-22, 28, 37

*United States v. Jinwright*,
    683 F.3d 471 (4th Cir. 2012) .......................................................42

*United States v. Kearney*,
    672 F.3d 81 (1st Cir. 2012), *cert. dismissed*,
    133 S. Ct. 1521 (2013)................................................................34

*United States v. Knox*,
    624 F.3d 865 (7th Cir. 2010) .......................................................44

*United States v. Laljie*,
    184 F.3d 180 (2d Cir. 1999) ..................................................16, 19

*United States v. Mackins*,
    32 F.3d 134 (4th Cir. 1994) ........................................................18

*United States v. McCauley*,
    253 F.3d 815 (5th Cir. 2001) .................................................17, 18

*United States v. McManus*,
    734 F.3d 315 (4th Cir. 2013) .......................................................38

*United States v. Montgomery*,
    262 F.3d 233 (4th Cir. 2001) .......................................................11

*United States v. Newsome*,
    322 F.3d 328 (4th Cir. 2003) .......................................................11

*United States v. Nkansah*,
    699 F.3d 743 (2d Cir. 2012) ........................................................26

*United States v. Odiodio*,
    244 F.3d 398 (5th Cir. 2001) ...................................................................16, 19

*United States v. Orr*,
    932 F.2d 330 (4th Cir. 1991) .........................................................13, 21, 23

*United States v. Penniegraft*,
    641 F.3d 566 (4th Cir. 2011) .......................................................................10

*United States v. Powell*,
    No. 3:07-CR-324, 2013 WL 1165221 (E.D. Va. Mar. 20, 2013),
    *aff'd in part, appeal dismissed in part*,
    No. 13-7030, 2014 WL 2566253 (4th Cir. June 9, 2014) ............................34

*United States v. Rodriguez*,
    140 F.3d 163 (2d Cir. 1998) ...................................................................16, 19

*United States v. Simpson*,
    741 F.3d 539 (5th Cir.), *cert. denied*,
    134 S. Ct. 2318 (2014).................................................................................32

*United States v. Sprick*,
    233 F.3d 845 (5th Cir. 2000) .......................................................................21

*United States v. Steffen*,
    741 F.3d 411 (4th Cir. 2013) .......................................................................38

*United States v. Stevens*,
    771 F. Supp. 2d 556 (D. Md. 2011).............................................................32

*United States v. Vann*,
    660 F.3d 771 (4th Cir. 2011) .......................................................................11

## STATUTES

18 U.S.C. § 1028A(a)(1).......................................................................1, 3

18 U.S.C. § 1028A(c)(5).......................................................................1, 3

18 U.S.C. § 1344 ............................................................................*passim*

18 U.S.C. § 1344(1) ..........................................................12

18 U.S.C. § 1344(2) ....................................................*passim*

18 U.S.C. § 1349 ..........................................................1, 3

18 U.S.C. § 1512 ............................................................46

18 U.S.C. § 1512(c) .........................................................31

18 U.S.C. § 1512(c)(1) ................................................*passim*

18 U.S.C. § 3231 ..............................................................1

18 U.S.C. § 3553 ............................................................39

18 U.S.C. § 3553(a) .........................................................38

18 U.S.C. § 3742(a)(1) .......................................................1

28 U.S.C. § 1291 .............................................................1

## RULES

Fed. R. Crim. P. 29 ....................................................*passim*

Fed. R. Crim. P. 29(b) ......................................................18

Fed. R. Crim. P. 33 ..........................................................7

## GUIDELINES

U.S.S.G. § 2B1.1 cmt. n.9(B) ...............................................41

U.S.S.G. § 2B1.1(b)(9)(A) ................................................2, 40

U.S.S.G. § 2B1.1(b)(10)(C) ...............................................2, 41

U.S.S.G. § 2B1.1(b)(15)(A) .................................................43

U.S.S.G. § 2B1.1(b)(16)(A) ............................................................2, 43, 44

U.S.S.G. § 2J1.2 ...............................................................................46

U.S.S.G. § 3C1.1 ..........................................................................2, 46

**OTHER AUTHORITIES**

Computer Crime & Intell. Prop. Sec., DOJ, *Searching and Seizing
Computers and Obtaining Electronic Evidence in
Criminal Investigations* 65 (3d ed. 2009) .................................................34

Corporate Fraud Accountability Act,
Pub. L. No. 107-204, 116 Stat. 807 (2002)...............................................31

Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002) ...........................31

# STATEMENT OF JURISDICTION

On May 2, 2012, defendant-appellant Daren Kareem Gadsden was charged by a grand jury sitting in the District of Maryland with violations of 18 U.S.C. §§ 1028A(a)(1) & (c)(5), 1344, 1349, and 1512(c)(1). JA 7, 21-38. Because these charges constitute offenses against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. § 3231.

This is an appeal from the final judgment and sentence imposed after Gadsden was convicted by a jury on July 22, 2013 and sentenced on November 21, 2013. JA 1160-62, 1346-51. Mr. Gadsden's notice of appeal was timely filed on December 4, 2013. JA 18. Accordingly, this Court has jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

I.    Whether this Court should reverse the district court's denial of Mr. Gadsden's motion for judgment of acquittal as to Counts 1-11, where the government voluntarily heightened its burden under 18 U.S.C. § 1344 and then-governing Fourth Circuit precedent to prove that two specific banks were victimized, but failed to meet its burden as to one of the banks.

II.   Whether, in light of the supervening Supreme Court decision in *Loughrin v. United States*, 134 S. Ct. 2384 (U.S. June 23, 2014), this Court should reverse the district court's denial of Mr. Gadsden's motion for judgment of acquittal as to

Counts 2-9, where the evidence was insufficient to find, under 18 U.S.C. § 1344(2), that the enumerated acts constituted false or fraudulent pretenses by means of which the fraud was accomplished as to both banks.

III.    Whether this Court should reverse the district court's denial of Mr. Gadsden's motion for judgment of acquittal as to Counts 12 and 13, where the evidence was insufficient to find that the deletion of the subject email accounts impaired the integrity or availability of any record, document or other object for use in any official proceeding and that it was Mr. Gadsden who deleted the accounts.

IV.    Whether the district court erroneously applied U.S.S.G. § 2B1.1(b)(9)(A) (misrepresentation of action on behalf of a government agency), § 2B1.1(b)(10)(C) (sophisticated means), § 2B1.1(b)(16)(A) (deriving more than $1,000,000 in gross receipts from financial institutions), and § 3C1.1 (obstruction of justice) to enhance Mr. Gadsden's offense level by eight points.

## STATEMENT OF THE CASE

According to the government, this case arises out of a conspiracy to defraud the Housing Authority of Baltimore City ("HABC") of approximately $1.4 million in the summer of 2010. JA 18-29. The co-conspirators carried out the fraud by initiating a series of unauthorized debits to HABC's account at Bank of America via the automated clearing house ("ACH") banking network. *Id.* The

unauthorized debits originated from an account at PNC Bank ("PNC") held by

Keith Daughtry Contracting LLC ("Daughtry LLC"), a fictitious entity the

conspirators created and enrolled in the ACH network. JA 25-57. Once posted to

the PNC account, the funds were withdrawn by the conspirators and their recruits

in several ways, including cash withdrawals at ATMs and bank branches, debit

card purchases, and ACH credits forwarding funds to ACH-enrolled accounts held

at other banks. JA 27-29. The other banks included MetaBank, which issued

prepaid debit cards ("netSpend cards") for accounts falsely opened in the names of

James Fisher ("J.F.") and Mark Gerald ("M.G."), JA 85, 328, 338; and Bank of

America, which held an account purportedly opened by J.F. as proprietor of James

Fisher Consulting LLC ("Fisher LLC"), JA 23-24. The conspirators' access to

HABC's account through the ACH network was terminated when the fraud came

under investigation in September 2010. JA 79.

The grand jury initially indicted co-conspirators Keith Daughtry and

William Darden in June 2011. A third co-conspirator, Tyeast Brown, and Mr.

Gadsden were indicted in December 2011. JA 4. On May 2, 2012, the grand jury

returned a third superseding indictment, charging Mr. Gadsden with one count of

conspiracy to commit bank fraud, 18 U.S.C. § 1349 (Count 1); eight counts of

bank fraud, 18 U.S.C. § 1344 (Counts 2-9); two counts of aggravated identity theft,

18 U.S.C. § 1028A(a)(1) & (c)(5) (Counts 10-11); and two counts of attempted

evidence tampering, 18 U.S.C. § 1512(c)(1) (Counts 12-13).  JA 18-28.  Mr.

Gadsden pled not-guilty to all counts.  JA 7.

A jury trial against Mr. Gadsden was held on October 1-15, 2012, but

because the jury could not reach a verdict, a mistrial was declared.  *See* JA 10.

New counsel was appointed to represent Mr. Gadsden.  JA 11.

A second trial took place on July 15-22, 2013, beginning with a preliminary

motions hearing.  JA 49-68.  Over four days of testimony, the government

presented 15 witnesses, including key witnesses Michael Hersh, Randall Harrell,

James Lyle, and Christa Phillips.  Hersh, a PNC corporate fraud investigator, JA

76-77, testified that PNC was the "ultimate victim" of the fraud, sustaining a net

loss of $1.1 million, JA 187-88.  Harrell, vice president of risk and compliance for

First ACH, a third-party payment processor, JA 279, testified that First ACH

enrolled the Fisher LLC account at Bank of America into the ACH network, JA

281.  Lyle, custodian of records and compliance coordinator for netSpend, the

prepaid debit card vendor, JA 327, testified regarding the process of opening the

J.F. and M.G. cards issued by MetaBank, including the email addresses given on

the card applications, JA 343-44.  Phillips, HABC's inspector general at the time

of the fraud, JA 190, testified that HABC had discovered two prior sets of

unauthorized ACH debits in the spring of 2010: one by Daren Gadsden LLC

("Gadsden LLC") for $3,400, JA 193, and another by Fisher LLC for $7,775, JA

214. The government did not offer the testimony of Rainbow Lin, HABC's chief financial officer, JA 217, who had testified in the first trial, JA 1222. According to Phillips, after the discovery of the Gadsden LLC debits, Phillips instructed Lin and another HABC employee to complete and submit a form (an "ACH block") by which Bank of America would disallow all ACH debits from HABC's account. JA 232-33. The form, however, was never submitted to Bank of America. *Id.* Significantly, the government offered *no* witnesses representing Bank of America.

Mr. Gadsden, according to the government, orchestrated a multi-stage scheme to obtain HABC's funds through ACH debits, beginning with the Gadsden LLC and Fisher LLC transfers. JA 22-25. Co-conspirators Brown and Darden, who fancied themselves "Bonnie and Clyde" because of several tax frauds and other schemes they led, JA 469, 637-38, testified that Mr. Gadsden approached Brown, who in turn approached Darden and Daughtry, in the spring of 2010, JA 571, 573, 580-81. The government sought to corroborate Brown and Darden's story primarily through documents and historical data from cell phone towers. *See* JA 820-21, 824-25. Mr. Gadsden's specific acts in execution of the fraud of HABC, according to the government, included incorporating Daughtry LLC (Count 4), falsely representing himself as Daughtry to PNC to inquire how to make ACH transfers (Count 5), originating a $9,000 ACH debit to HABC's account (Count 6), withdrawing funds from Daughtry LLC's account via ATMs and

purchases (Counts 7-9), and opening netSpend cards with identifying information belonging to J.F. and M.G. (Counts 2-3, 10-11). JA 30-31.

For proof as to the evidence tampering counts (Counts 12-13), the government offered FBI Special Agent Brad Lynch, who testified that in April 2011, he left his business card at Mr. Gadsden's home for Mr. Gadsden to contact him. JA 769-70. On April 14, Mr. Gadsden called Lynch, who said he wanted to speak to Mr. Gadsden about a bank fraud investigation. *Id.* Records later produced by Google in response to a government subpoena reflected that the email addresses that had been given to netSpend to register the M.G. and J.F. debit cards were deleted on April 16 and 21, respectively. JA 771-73. Significantly, the government offered *no* testimony from which it could be inferred that the deletions of the e-mail accounts impaired, impeded, or obstructed the government's investigation.

At the close of the government's case,[1] Mr. Gadsden moved through counsel for a judgment of acquittal, which the district court denied. JA 961-64, 968. No witnesses were offered in Mr. Gadsden's defense. JA 973. Prior to closing arguments, the district court held a jury instruction conference. JA 977-96. The government sought and obtained modifications to several instructions to pluralize

---

[1] The foregoing summary is supplemented with additional facts as pertinent in the arguments below.

references to "banks" and "financial institutions" as the subjects of Mr. Gadsden's alleged scheme to defraud PNC as well as Bank of America. JA 987-90.

On July 22, 2013, the jury convicted Mr. Gadsden of all 13 counts of the indictment. JA 1160-62. Through counsel,[2] Mr. Gadsden supplemented his in-court motion with a written motion for judgment of acquittal under Rule 29 and for a new trial under Rule 33. JA 16. The district court denied the motion in a memorandum opinion issued on November 20, 2013. JA 17, 1271-94. The next day, the district court held a sentencing hearing. JA 16. Mr. Gadsden objected to the applicability of certain enhancements that increased his base offense level by eight points under the U.S. Sentencing Guidelines ("Guidelines"). JA 1301, 1304-06, 1309-14, 1316-17. The district court applied all the enhancements, ultimately finding Mr. Gadsden to be a Category III offender with a total offense level of 37. JA 1339. Mr. Gadsden received concurrent sentences of 262 months' imprisonment on Counts 1-9, plus 24 months on Counts 10-11 to run consecutive to Counts 1-9, and 240 months on Counts 12-13 to run concurrently with Counts 1-9, for a total of 286 months' imprisonment. JA 1341. Among other conditions, the

---

[2] On July 29, 2013, Mr. Gadsden filed a *pro se* motion for a judgment of acquittal. JA 16. On July 30, the government moved to strike the motion and opposed it on the merits. *Id.* On July 31, Mr. Gadsden filed an amended *pro se* motion for a judgment of acquittal. *Id.* On August 5, Mr. Gadsden moved, through counsel, for a new trial and for a judgment of acquittal. *Id.* In this motion, trial counsel requested additional time to submit a brief the motion in order to receive trial transcripts. On August 6, the district court ordered Mr. Gadsden to file a supplemental memorandum by September 4. *Id.*

district court also ordered Mr. Gadsden to pay restitution of $1,399,700 on behalf of PNC as "the victim."  JA 1342.

## SUMMARY OF THE ARGUMENT

I.      The evidence was insufficient to support Mr. Gadsden's convictions for bank fraud conspiracy (Count 1), eight executions of that conspiracy (Counts 2-9), and aggravated identity theft (Counts 10-11).  The central premise of each count was the alleged existence of a scheme to defraud both PNC and Bank of America. Under the default rule of disjunctive pleading and instruction, it would have been legally sufficient for the government to prove that *either* PNC or Bank of America were victims of the scheme to defraud.  At the government's own request during the jury instruction conference, however, the jury instructions were modified to require proof of victimization in the *conjunctive*.  Because it was the government's burden to prove *both* banks had been exposed to an actual or potential risk of loss, but the government failed to meet its burden as to Bank of America, the verdict as to Counts 1-11 should be vacated.

II.     After this appeal was filed, the Supreme Court decided, in *Loughrin v. United States*, 134 S. Ct. 2384 (U.S. June 23, 2014), that § 1344(2) does not require proof of intent to defraud a bank.  But that section still requires proof that property in the custody or control of a qualifying financial institution ("bank property") was obtained *by means of* a misrepresentation that naturally induces that

bank to part with the property. Further, it remained the government's burden to prove this element as to *both* PNC and Bank of America. The evidence was insufficient to show that any of the conduct alleged in Counts 2-9 constituted a misrepresentation that naturally influenced *Bank of America's* decision to release bank property through the ACH network. For similar reasons, the evidence was insufficient as to Counts 1, 10, and 11. Accordingly, even under *Loughrin*, the verdict as to Counts 1-11 should be vacated.

III.    Counts 12-13 charged Mr. Gadsden with evidence tampering based on the barest circumstantial evidence that the email accounts at issue, "jamesfisherconsulting@gmail.com" and "dkgcredit1@gmail.com," were allegedly deleted by Mr. Gadsden after Lynch informed him of the bank fraud investigation. Although the email addresses corresponding to the accounts were given to netSpend to open the J.F. and M.G. debit cards (Counts 2-3), there was no evidence to show that the accounts actually contained relevant email at the time the accounts were deleted. Thus, the evidence was insufficient to find beyond a reasonable doubt that the deletion of the subject email accounts impaired the integrity of the FBI's investigation of the theft of HABC funds or availability of any records, documents, or other objects for use in that investigation. The evidence was also insufficient to permit the jury to find beyond a reasonable doubt

that Mr. Gadsden deleted the accounts; therefore, the jury's verdict as to Counts 12-13 should be vacated.

IV.     Over Mr. Gadsden's objection, the district court adopted four sentencing enhancements — three for specific offense characteristics, namely misrepresentation of action on behalf of a government agency, sophisticated means, and deriving more than $1,000,000 in gross receipts from financial institutions; and one adjustment for obstruction of justice.  The enhancements increased Mr. Gadsden's calculated total offense level to 37, yielding a sentencing range of 262-327 months.  Without the enhancements, his total offense level would have been 29, with a substantially lower range of 108-135 months.  Because the government failed to prove the applicability of the enhancements by a preponderance of the evidence, in the event this Court declines to vacate the jury's verdict, this case nevertheless must be remanded for resentencing.

## ARGUMENT

## I.     Because the government required itself to prove that both PNC and Bank of America were victims of the scheme to defraud, but failed to meet its burden, the verdict as to Counts 1-11 must be vacated.

### *Standard of Review*

This Court reviews the denial of a Rule 29 motion *de novo*.  *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011).  Where, as here, the motion was based on insufficient evidence, "[t]he verdict of a jury must be sustained if there is

substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). This Court defines "'substantial evidence,' in the context of a criminal action, as that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v. Newsome*, 322 F.3d 328, 333 (4th Cir. 2003) (quoting *United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc)). While reversal is reserved for the "rare case where the prosecution's failure is clear," *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997), Mr. Gadsden respectfully submits that such failure is clear in his case because the government must be held to its chosen trial strategy.

>    **A.** **The jury instructions were modified at the government's request to mandate a conjunctive reading of the phrase "PNC Bank and Bank of America" by pluralizing "banks" and "financial institutions," and its choice must be enforced on appeal.**

"[I]t is settled that a charging document must allege conjunctively the disjunctive components of an underlying statute." *United States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (en banc) (per curiam for en banc majority). The rule protects the due process rights of criminal defendants, *see id.* at 774 n.4, while permitting the jury to be instructed in the disjunctive, *United States v. Montgomery*, 262 F.3d 233, 242 (4th Cir. 2001).

The bank fraud statute provides that:

[w]hoever knowingly executes, or attempts to execute, a scheme or artifice –

(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.  The statute's subsections proscribe different conduct.  *United States v. Brandon*, 298 F.3d 307, 311-12 (4th Cir. 2002).  In this case the government conjunctively alleged the disjunctive components of the bank fraud statute.  *See* JA 24-31; *see also United States v. Celesia*, 945 F.2d 756, 758-59 (4th Cir. 1991) (indictment may track the language of both subsections).

Nested within its pleading, however, the government averred conjunctively that two banks — PNC *and* Bank of America — were the victims of the alleged fraud (Counts 2-9), and by incorporation by reference, the alleged conspiracy (Count 1) and identity thefts (Counts 10-11).  JA 24-33.  As such, the government was required to prove beyond a reasonable doubt the elements of either subsection of § 1344, as to *both* banks, regardless of which subsection it chose to pursue as its theory of the case.

The government proceeded on the theory that Mr. Gadsden violated § 1344(2).[3]  At the time of trial, the circuits were split as to whether § 1344(2)

---

[3] The jury ultimately was instructed as to the requirements of that section rather than § 1344(1).  *See* JA 1123.

required proof that the subject financial institution was an actual or intended victim of the fraud.  The Fourth Circuit followed the view requiring proof of bank victimization.  "Because § 1344 focuses on the bank, rather than on the potential victims," this Court reasoned, "a conviction under § 1344 is not supportable merely by evidence that some person other than a federally insured financial institution was defrauded in a way that happened to involve banking, without evidence that such an institution was an intended victim."  *Brandon*, 298 F.3d at 311-12; *see also United States v. Orr*, 932 F.2d 330, 332 (4th Cir. 1991) ("[T]he legislative history of 18 U.S.C. § 1344 'makes it abundantly clear that Congress did not intend the bank fraud statute to cover ordinary state law offenses, where, as here, the fraud victim was not a federally insured bank.'") (quoting *United States v. Blackmon*, 839 F.2d 900, 905 (2d Cir. 1988)).  This requirement could be satisfied by proof that the victim bank was exposed to an actual or potential risk of loss.  *Brandon*, 298 F.3d at 312 (quoting *United States v. Colton*, 231 F.3d 890, 908 (4th Cir. 2000)).

After the government rested, counsel for Mr. Gadsden moved for a judgment of acquittal and the district court heard oral argument.  Defense counsel pointed out that the charges in the indictment concerned two specifically identified victims within the same counts.  JA 961-64, 968.  The government initially disagreed but argued that its proof nonetheless sufficed to show that Bank of America was an

intended victim.  JA 964, 967.  The next morning, however, at the jury instructions conference, the government voluntarily requested changes to the instructions to pluralize the word "bank":

> THE COURT: Government, 35?
> MR. RAMAN: Your Honor, in light of some of the discussion we had yesterday [*at oral argument on the Rule 29 motion*], I would ask the Court, where it says, first, that there was a scheme to obtain money or funds owned or under the custody or control of banks, plural; that is, rather than a bank. Second element, we would ask the Court to instruct the scheme with the intent to defraud the banks, plural.  Third element, that, at the time of the execution of the scheme, the banks, plural, had their deposits insured by the FDIC.
> THE COURT: Any objection, Mr. Fischer?
> MR. FISCHER: No, Your Honor.
> THE COURT: Although I would note that making those changes sounds like you're buying into the conjunctive.
> MR. RAMAN: It does heighten the [g]overnment's burden.  We are confident we can meet that burden.

JA 987-88.

The conference proceeded, and "bank" was pluralized throughout the instructions except in the definition of "scheme to defraud."  JA 989.  The court suggested that "institution" be pluralized as well "given [the defense's] argument and the [g]overnment's concession."  JA 990.  The government accepted the change without objection.  *See id.*

Accordingly, by its own requested modifications to the jury instructions, the government conceded that Mr. Gadsden could not be convicted of the alleged scheme to defraud without proof that Bank of America was an intended victim.

*See* JA 25-25 (Count 1) (charging conspiracy "to execute . . . a scheme . . . to defraud financial institutions, namely, Bank of America and PNC Bank, and to obtain [property] of financial institutions, namely Bank of America and PNC Bank, and under the custody and control of financial institutions, namely Bank of America and PNC Bank" through misrepresentations).  Moreover, the same construction necessarily extended to Counts 2-9.  *See* JA 30 (Counts 2-9, ¶ 1) (incorporating by reference, *inter alia*, Count 1 ¶¶ 29, 38, and 44, alleging transfers out of HABC's account at Bank of America).  Similarly, Counts 10-11 incorporated these paragraphs and referenced to Counts 2-3.  JA 32-33. Necessarily, then, the government conceded that Mr. Gadsden could not be convicted of bank fraud or aggravated identity theft based on bank fraud without that same proof.

> **B.     The government failed to produce evidence that Bank of America was an actual or intended victim of bank fraud.**

For reasons unknown, the government chose not to call a witness from Bank of America or an expert witness to establish that bank's actual financial loss or exposure to potential loss as a result of Mr. Gadsden's actions.  The conspicuous absence of such testimony is critical.  Without it, the government could not prove beyond a reasonable doubt that Mr. Gadsden conspired to commit, or actually committed, bank fraud *against Bank of America*.  Therefore, his convictions as to Counts 1-11 should be vacated.

Other courts examining the sufficiency of the government's evidence in similar fact patterns, most notably the Second and Fifth Circuits, have reversed in the absence of proof of risk of loss to the victim bank.

For example, the Second Circuit found no risk of loss in two cases where employees had fraudulently procured otherwise-genuine checks from their employers and deposited them in bank accounts for their own use. *United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999); *United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998). The drawee banks were found to have had no responsibility to perceive that the owners of the accounts had been deceived in issuing the checks, and thus in accepting the instruments they had not been exposed to a risk of loss as a matter of law.

Likewise, in *United States v. Odiodio*, 244 F.3d 398 (5th Cir. 2001), a stolen check was deposited into an account at a brokerage house and the funds subsequently transferred *by wire* into accounts at two federally-insured banks. *Id.* at 400. The defendants then wired the funds out of the country. *Id.* Applying the principles of state banking law, the Fifth Circuit found as a matter of law that the federally-insured banks could have no legal liability because they "*never handled the fraudulent instrument*," "parted with no money of their own," and owed no money to the brokerage, which dealt with the stolen check. *Id.* at 401-02 (emphasis added); *see Bradford Trust Co. v. Texas American Bank-Houston*, 790

F.2d 407 (5th Cir. 1986) (as between initiating bank and receiving bank, initiating bank was liable for losses resulting from fraudulently induced wire transfer (applying Texas law)).  Accordingly, the court reversed the jury's verdict convicting the defendants of bank fraud.  *Id.* at 402.

By contrast, in *United States v. McCauley*, 253 F.3d 815 (5th Cir. 2001), the government satisfied its evidentiary burden to show that Chase Bank was exposed to a risk of loss by presenting evidence that Chase was deprived of the opportunity to earn interest on $150,000 in customer funds fraudulently transferred out of its customer's account, for longer than one day, to MetroBank.  *See id.* at 820.  In that case, an employee of the Chase customer fraudulently caused her employer to wire funds to MetroBank to an account her co-conspirators opened with false information.  While the *McCauley* opinion does not reveal whether a Chase witness provided the evidence that was upheld as sufficient to sustain a bank fraud conviction based on Chase as a victim, it is beyond dispute that no similar evidence was offered by Hersh or Phillips in this case.  The government's failure to put on evidence from a Bank of America representative to establish that the scheme to defraud put it at a potential risk of loss was critical.

The above examples illustrate that the testimony the government elicited from Hersh and Phillips cannot reasonably be examined in isolation from the realities of banking and commercial law, including the rules of operation of the

ACH network. Yet the government offered zero evidence to prove or even explain these rules, as Hersh's jargon-filled testimony shows. Viewed in the light most favorable to the government, the jury could reasonably infer that Hersh was familiar with the operation of the ACH network through his employment as a PNC fraud investigator. Hersh testified that an unidentified employee informed him that "a PNC customer was going to receive returns from Bank of America" in the amount of approximately $1.3 million, and that this large dollar amount prompted him to begin investigating the Daughtry LLC account. JA 79. The jury reasonably could have understood that Hersh used the term "return" in its context in ACH transactions to mean that Bank of America was instructing PNC to reverse the ACH debits from HABC's account to the Daughtry LLC account (*i.e.*, to return the funds to HABC's account).[4] However, Hersh's testimony, unlike the specific testimony the government presented in *McCauley*, provided no basis for the jury to reasonably infer that Bank of America had been exposed to a risk of loss in this case. Factually, Hersh evidenced no knowledge that Bank of America bore any financial loss. When asked by the government who the "ultimate victim" of the

---

[4] To the extent the district court relied on the testimony Rainbow Lin gave in the first trial, which was not offered in the second trial, to attempt to reconcile Hersh's testimony as to Bank of America's risk of loss, JA 1286-87, that reliance was erroneous. *See* Fed. R. Crim. P. 29(b); *cf. United States v. Mackins*, 32 F.3d 134, 138-39 (4th Cir. 1994) (trial court erroneously considered evidence likely to be admissible in a future trial). In any event, neither the cited portion of Lin's testimony in the first trial nor Hersh's in the second was sufficient to establish that Bank of America suffered a potential loss.

scheme was, Hersh testified it was PNC, having lost the $1.4 million dollars the government alleged in ¶ 44 of the indictment. JA 187. According to Hersh, PNC was able to recoup about $300,000 of the $1.4 million from various unnamed sources. JA 188. Bank of America was *not* named as contributing to this $300,000 figure. *See* JA 188.

Here, Bank of America was in a position analogous to that of the drawee banks in *Laljie* and *Rodriguez* and the receiving banks in *Odiodio*. The government offered zero testimony, documentary evidence, or law showing that Bank of America had a duty to perceive that HABC had not in fact authorized the ACH debits originating from the Daughtry LLC account at PNC. The testimony of HABC's former inspector general, Phillips, regarding an "ACH block" that was never filed with Bank of America actually compels the opposite conclusion. According to Phillips, after the initial fraud against HABC was discovered in March 2010, HABC took remedial steps to prevent a subsequent loss of funds. JA 231-34. Rainbow Lin, its CFO, filled out and signed an "ACH block" form which, according to Phillips, is a "document that Bank of America produces that, if executed by [HABC], the owner of the account, *would prevent unauthorized transactions through the automatic clearing house network*." JA 232-31 (emphasis added). According to Phillips, another HABC employee neglected to file the completed paperwork with Bank of America, resulting in the substantial losses to

HABC later that year.  JA 233.  The logical inference to be drawn is that Bank of America could not be held liable for losses suffered by HABC through the ACH network unless this ACH block — a "document," according to Phillips, that is "produced" by Bank of America — was placed on HABC's account.  That document was not produced at trial for the jury to consider.  Nor was any testimony given to support an inference that Bank of America was liable to HABC in the *absence* of the ACH block.

To the contrary, the ACH block likely was the document that would have created liability in Bank of America had it been in place during the Daughtry LLC fraud.  See *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, CIV. 09-2751, 2010 WL 4224473 at *8-10 (E.D. Pa. Oct. 22, 2010), for an explanation of the operation of the rules applicable to the ACH network in a situation factually analogous to that presented by the Daughtry LLC fraud.  Under those rules, which apply as between banks conducting ACH transactions, a party in HABC's position has no legal right to claim the benefit of a warranty running from the financial institution that originates an ACH transaction (here, PNC) to the financial institution receiving that transaction (here, Bank of America) that the transaction it originates is properly authorized.  *See id.*

Moreover, the jury could not reasonably infer from the mere opening of the Fisher LLC account at Bank of America that *that* bank was an intended victim of

the scheme to defraud HABC of $1.4 million.  *See Orr*, 932 F.2d at 332 (that a bank account is opened using false information is not itself enough to establish a § 1344 violation as to that bank).  The evidence at trial showed that of the $1.4 million PNC debited from HABC's account, $255,402 was forwarded via ACH credits the Fisher LLC account.  JA 1464-65.  The flow of HABC funds out of Bank of America's custody and then back in to Bank of America's custody (albeit in a different account) was, in both instances, originated by PNC.  JA 1720-47.  Therefore, as discussed above, in both instances PNC warranted to Bank of America that the ACH transfers were authorized.

Hersh's and Phillips' testimony were wholly insufficient to permit any rational fact-finder to infer that Bank of America was exposed to an actual or potential risk of loss.  *Cf. United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000) (reversing bank fraud conviction where government "provided no basis at trial or on appeal for concluding that the [drawee] bank could have [civil] liability").  The obvious, intended victim of the scheme to defraud was HABC, not Bank of America.  "[N]o matter how generously [this Court] indulge[s] the available *reasonable* inferences in favor of the Government," reading Hersh's and Phillips' testimony to establish that Bank of America was an intended victim of the scheme to defraud HABC simply "require[s] reasoning so attenuated as to provide insufficient support for the jury's verdict."  *United States v. Hickman*, 626 F.3d

756, 764 (4th Cir. 2010) (emphasis in original).  Accordingly, the convictions as to

Counts 1-11 should be vacated because the government failed to meet a critical

evidentiary burden it set for itself.

**II.** **In the alternative, because the government required itself to prove that the conspirators obtained HABC's funds by means of misrepresentations to both PNC and Bank of America, but failed to meet its burden, the verdict as to Counts 1-11 must be vacated.**

### *Standard of Review*

As stated above, this Court reviews the denial of a Rule 29 motion *de novo*.

**A.** **This Court should not retroactively apply the new substantive rule of *Loughrin v. United States* because that rule unexpectedly broadens the scope of § 1344(2) by eliminating the intended victim requirement previously applied in this Circuit.**

After this appeal was filed, the Supreme Court held in *Loughrin v. United*

*States*, 134 S. Ct. 2384 (U.S. June 23, 2014), that § 1344(2) does not require proof

of intent to defraud a bank.  *Id.* at 2387.  Accordingly, this Court must determine

whether the rule of *Loughrin* applies retroactively to this proceeding to rescue the

government from its failure to prove Bank of America was an intended victim of

the scheme to defraud HABC.

"When a decision of th[e] Supreme Court results in a 'new rule,' that rule

applies to all criminal cases still pending on direct review."  *Schriro v. Summerlin*,

542 U.S. 348, 351 (2004) (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)).

"New substantive rules generally apply retroactively.  This includes decisions that

narrow the scope of a criminal statute by interpreting its terms . . . ." *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 620-621 (1998)). However, this is *not* the case where a new substantive rule broadens the scope of a criminal statute. That is because "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). *Loughrin* expands liability under § 1344(2) by eliminating an element, bank victimization, this Circuit's *prior* precedents required. *Compare Brandon*, 298 F.3d at 311-12, *and Orr*, 932 F.2d at 332, *with United States v. Adepoju*, 756 F.3d 250, 255 (4th Cir. June 23, 2014) (stating, on the basis of the 10th Circuit's opinion that was affirmed by the Supreme Court the same day, and without citing prior Fourth Circuit precedent on point, that § 1344(2) does not require proof that the bank is the intended victim of the fraud).

This Court therefore should not retroactively apply *Loughrin* to this appeal, but should vacate the jury's verdict as to Counts 1-11 for the reasons stated in Part I, *supra*.

**B.**   **Even if this Court does retroactively apply *Loughrin*, the government was required to prove that both PNC and Bank of America were induced to release HABC's funds "by means of" misrepresentations — but it failed to produce sufficient evidence as to Bank of America.**

Both before and after *Loughrin*, the text of subsection (2) of the bank fraud statute has required proof that the defendant obtained (or attempted to obtain) funds in a federally-insured bank's custody or control "by means of false or fraudulent pretenses, representations, or promises." *See* § 1344(2). The Supreme Court had previously held that the bank fraud statute implicitly requires proof that the subject false statement is *material*, meaning that it "has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)); *see also United States v. Colton*, 231 F.3d 890, 898-99 (4th Cir. 2000) (applying *Neder*). Thus, materiality was a required element at the time of the trial in this case. The jury was instructed as follows:

> The false or fraudulent representation or failure to disclose must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. This means that, if you find a particular statement of fact was false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision. The same principle applies to fraudulent half truths or omissions of material facts.

JA 1124.

In *Loughrin*, however, the Supreme Court refocused the inquiry on the meaning of the statutory phrase "by means of" rather than either *Neder*'s implicit materiality requirement or the former bank victimization requirement (which had arisen, according to the Supreme Court, from a conjunctive reading of the statute's subsections). *See Loughrin*, 134 S. Ct. at 2393-94. As the Supreme Court explained:

> Under [§ 1344(2)], it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property "by means of" the misrepresentation. That phrase typically indicates that the given result (the "end") is achieved, at least in part, through the specified action, instrument, or method (the "means"), such that the connection between the two is something more than oblique, indirect, and incidental. *See, e.g.*, Webster's Third New International Dictionary 1399 (2002) (defining "by means of" as "through the instrumentality of: by the use of as a means"); 9 Oxford English Dictionary 516 (2d ed. 1989) (defining "means" as "[a]n instrument, agency, method, or course of action, by the employment of which some object is or may be attained, or which is concerned in bringing about some result"). In other words, not every but-for cause will do. . . . [The] "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control.

*Id.* at 2393. The phrase "by means of," the Court summarized, limits the statute to "deceptions that have some real connection to a federally insured bank," *id.* at 2394-95, or in other words, "frauds in which a false statement will naturally reach [a federally insured] bank," *id.* at 2394 n.8. By way of a footnote, the majority also rejected Loughrin's argument that § 1344(2) separately required proof "that the

defendant's scheme created a risk of financial loss to the bank." *Id.* at 2395 n.9. The majority commented that § 1344(2)'s text "appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud." *Id.* (citing *United States v. Nkansah*, 699 F.3d 743, 754 (2d Cir. 2012) (Lynch, J., concurring in part and concurring in judgment in part). Finding that the defendant's act of presenting forged or altered checks to a merchant satisfied the "by means of" requirement because the merchant could be expected to forward the checks to a bank for payment in the ordinary course, the Supreme Court upheld Loughrin's bank fraud conviction. *Id.* at 2395.

Thus, under *Loughrin*, the government would have been required to prove that HABC's funds were obtained from each of PNC and Bank of America by means of false statements that were the mechanism naturally inducing each bank to part with HABC's funds. The evidence at trial was insufficient to meet that standard.

Once again, the critical failure was the lack of testimony from a Bank of America representative. There was no evidence that Bank of America was naturally induced to part with HABC's funds by any of the acts enumerated in Counts 2-9.

First, as to Counts 2-3, there was no evidence linking the mere act of opening the J.F. and M.G. netSpend debit cards to any unauthorized disbursements of funds from HABC's account at Bank of America to those cards. Rather, the J.F. and M.G. netSpend cards were funded via ACH transfers directly from the Daughtry LLC account at PNC. JA 1463-72, JA 1797-98. This occurred *downstream* of the flow of HABC funds from Bank of America to PNC due to the Daughtry LLC originations. *See* JA 1842-61. Therefore, no rational fact-finder could conclude that *Bank of America* was induced to part with HABC funds *by means of* the opening of the J.F. and M.G. netSpend debit cards.[5]

As to Count 4, there was no evidence showing that the filing of false articles of organization for "Kieth [*sic*] Daughtry Contracting LLC" itself had any real connection to *Bank of America*. Certainly, that act had a real connection to PNC in that the articles of incorporation were presented to that bank to open the Daughtry LLC account, JA 1506-13, and PNC then enrolled that account in the ACH network, JA 1518-22. But, as discussed in Part I.B., *supra*, there was no evidence that PNC retransmitted the false statement — the filing of false articles of organization — to Bank of America via originating the ACH debits. Thus, there

---

[5] There was no evidence that either netSpend (the card provider), or MetaBank (the issuing bank) were federally insured banks at the time of the events alleged in the indictment. Thus, evidence that funds were obtained from netSpend or MetaBank by means of false statements would have been insufficient, in itself, to constitute the offense of bank fraud.

was no evidence that there was anything more than an oblique, indirect, and incidental relationship between the filing of the articles of organization and Bank of America's disbursements to PNC.

Count 5 presents an even further attenuated relationship between the alleged false statements — telephone calls to PNC's ACH help line by Mr. Gadsden, identifying himself as Keith Daughtry — and Bank of America's disbursements to PNC. There was zero proof that anyone ever communicated these statements to Bank of America. There was absolutely no basis from which a rational fact-finder could even infer that Mr. Gadsden's allegedly falsely identifying himself *to PNC's help line operators*, JA 1545-86, could possibly have been a mechanism naturally inducing Bank of America to disburse funds to PNC. *See Hickman*, 626 F.3d at 764.

The evidence was similarly insufficient as to the allegation of Count 6, that Mr. Gadsden "[c]aused an unauthorized ACH transfer of $9,000 from [HABC's] account at Bank of America . . . to the [Daughtry LLC] account at PNC." JA 30. Again, the actual mechanisms by which the ACH network operates cannot be ignored simply because they are less familiar than the process by which instruments (checks) are drawn on and presented to banks for payment. *See* discussion *supra* Part I.B. It is undisputed that HABC did not in fact authorize Daughtry LLC to originate ACH debits from its Bank of America account.

However, there was no testimony or other evidence from which a rational fact-finder could determine whether PNC could pass Daughtry LLC's false statements to Bank of America through the ACH network. *Cf. United States v. Briggs*, 965 F.2d 10, 12 (5th Cir. 1992) (a wire transfer itself does not constitute a misrepresentation); *Clinton Plumbing*, 2010 WL 4224473 at *8-10 (describing the originator's warranty under ACH rules).

Counts 7-9 suffered from the same evidentiary deficiency as Counts 2-3: namely, these counts each allege outflows from the Daughtry LLC account that necessarily occurred subsequent to the unauthorized debits to HABC's account, such that no rational fact-finder could conclude that *Bank of America* had been induced to part with HABC funds *by means of* the downstream withdrawals from PNC.

Finally, for similar reasons, the evidence as to Counts 1, 10, and 11 was also insufficient to show that Bank of America was induced to part with HABC funds by means of false statements. Counts 10 and 11 fail by incorporation of Counts 2 and 3. *See* JA 1128-29 (jury instruction requiring that "the Defendant used the means of identification during and in relation to executing the bank fraud offenses charged in the Indictment"). Regarding Count 1, the specific paragraphs of the indictment charging conduct that relates to Bank of America again were not supported by evidence of misrepresentations by means of which Bank of America

was induced to release HABC's funds.  *E.g.*, JA 26-29 at ¶ 29 (no evidence that Bank of America was provided any documentation of Daughtry LLC's false contract to provide services to HABC requiring payment); ¶ 38 (no evidence that the $250,000 transferred to the Fisher LLC account at Bank of America was not first ACH debited by PNC, such that no additional false representations were made by the ACH credits to Fisher LLC); and ¶ 44 (summarizing the result of the scheme to defraud via Daughtry LLC's instructing PNC to originate ACH debits to the HABC account).

As the government conceded below, the evidence demonstrated that PNC was the "ultimate victim" in this case.  JA 187.  While HABC was the target, PNC is the only federally insured bank shown to have been induced to release funds it held *by means of* false pretenses.  There was zero proof that the legitimacy or non-legitimacy of Daughtry LLC had any impact on *Bank of America*'s conduct in permitting HABC's account to be debited.  A reasonable trier of fact simply had no evidence to support the conclusion that the conspirators' misrepresentations reached Bank of America.  *See Loughrin*, 134 S. Ct. at 2393-95.  Thus, even if the *Loughrin* standard is applied, which it should not, the verdict as to Counts 1-11 still should be vacated.

**III.** **The evidence was insufficient to find that the deletion of two email accounts impaired the integrity or availability of any record, document, or other object for use in an official proceeding and to find that Mr. Gadsden was responsible for their deletion.**

*Standard of Review*

As stated above, this Court reviews the denial of a Rule 29 motion *de novo*.

**A.** **The government failed to show that the email accounts contained any "record, document, or other object" or that the email accounts themselves were "record[s], document[s], or other object[s]."**

The Corporate Fraud Accountability Act, enacted as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), criminalized the following conduct:

> Whoever corruptly –
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
> shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* at 807 (18 U.S.C. § 1512(c)). Referencing the "jamesfisherconsulting" and "dkgcredit1" Gmail accounts, Counts 12-13 of the third superseding indictment charged that Mr. Gadsden

> attempted to and did corruptly alter, destroy, mutilate, and conceal a record, document, or other object, with the intent to impair the object's integrity or availability for use in an official proceeding, namely, the Grand Jury's, the United States Attorney's Office's, and the FBI's investigation of the theft of Housing Authority funds.

JA 35-36 (Count 12, ¶ 6; Count 13, ¶ 3). Both counts cited *only* § 1512(c)(1) as the basis for the charge. *Id.* Therefore, the government was required to prove beyond a reasonable doubt that (i) a "record, document, or other object" (ii) was altered, destroyed, mutilated, or concealed (iii) by Mr. Gadsden, (iv) with the intent to impair the integrity or availability of that record, document, or other object for use in an official proceeding.

An email message is a "record, document, or other object," but whether an email *account* is within the scope of § 1512(c)(1) appears to be an open question. The mere deletion of an email message — assuming there is evidence to infer that an email message exists — is not necessarily enough to support a conviction under this statute. *See United States v. Simpson*, 741 F.3d 539, 551-52 (5th Cir.) (declining to decide the question, finding that evidence was sufficient to affirm conviction where in addition to deleting email messages, defendant destroyed hard drive on which emails had been stored), *cert. denied*, 134 S. Ct. 2318 (2014). While the successful destruction of a record, document, or other object is not required to convict, *United States v. Stevens*, 771 F. Supp. 2d 556, 563 (D. Md. 2011), there must be *some* basis from which to infer that a record, document, or other object *existed* before its attempted deletion could constitute chargeable conduct.

In this case, the government failed to present evidence regarding the existence of email in the accounts and the ramifications of merely "deleting" an email account. Lynch successfully obtained records from Google reflecting the subscriber information for the two deleted accounts and the login history going back four weeks from the date Google searched its records. *See* JA 1990-95 (Ex. 107, 108, 109); *see also* JA 539 (testimony of Google custodian Darren Hubbard stating that at that time, Google could only maintain four weeks of login history). Lynch also obtained subscriber information regarding the "darengadsden@gmail.com" account, which he asserted was linked to the "jamesfisherconsulting" and "dkgcredit1" email accounts by one instance of the use of a common internet protocol (IP) address. *See* JA 1990-95. Thus, even assuming an email account is a "record, document, or other object" within the meaning of § 1512(c)(1), the evidence showed that "records" of the email accounts themselves were available for use in this proceeding.

Essentially, the government's interest in the "jamesfisherconsulting" and "dkgcredit1" accounts was two-fold: (1) identify the accountholders; and (2) examine the accounts' contents. There was no evidence that the first objective was or could have been impaired by the deletion of the accounts. Any impairment could have been attributed to the government's apparent failure to resolve the geographical locations of the IP addresses by obtaining the necessary information

from the internet service providers.  *See United States v. Kearney*, 672 F.3d 81, 90 (1st Cir. 2012) ("the Department of Justice's manual cautions investigators to make sure that the ISP 'identif[ies] which of its customers was assigned [the relevant] IP address at the relevant time'") (citing Computer Crime & Intell. Prop. Sec., DOJ, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 65, 242 (3d ed. 2009)), *cert. dismissed*, 133 S. Ct. 1521 (2013).

As to the second objective, in contrast with other cases involving the deletion of email, here, there was practically no evidence presented at trial establishing that the "jamesfisherconsulting" and "dkgcredit1" email accounts actually contained email in April 2011.  *Cf. United States v. Powell*, No. 3:07-CR-324, 2013 WL 1165221 at *8 (E.D. Va. Mar. 20, 2013) (finding an attempt to destroy evidence where defendant instructed his landlord to "'log in to my computer,' delete all email messages from Microsoft Outlook, and delete specific Google Gmail accounts, including '*EVERY* Google account you see on my computer on Internet Explorer'") (emphasis in original), *aff'd in part, appeal dismissed in part*, No. 13-7030, 2014 WL 2566253 (4th Cir. June 9, 2014).  First, there was no evidence that the conspirators communicated by email.  Second, Lyle of netSpend testified that these email addresses were provided in the applications to open the J.F. and M.G. debit cards.  JA 343-44.  According to Lyle, netSpend's

records reflected that a single email had been sent to "jamesfisherconsulting @gmail.com" in April 2010.  JA 361-63.  The email purportedly contained a netSpend form for setting up direct deposit to the debit card.[6]  JA 363.  But netSpend's records as to the M.G. debit card reflect no similar email sent to that account.  *See* JA 1879-90.  Thus, the jury was left to speculate that emails from netSpend actually existed in these accounts as of April 2011, when Lynch left his business card at Mr. Gadsden's home.  Given that the J.F. and M.G. debit cards had been opened in April 2010 — and there was no reason to expect that the person(s) who received email(s) (if any) from netSpend for these accounts would have maintained them — it could not reasonably be inferred that the hypothetical emails still existed at the time when Lynch contacted Mr. Gadsden.  Yet such an inference would be necessary to find the subsequent deletion of the *accounts* sufficiently likely to impair an official proceeding.  As the jury was instructed, the government had to prove that "the natural and probable effect" of the deletions, "if successful, would be to impair the object's availability for use in an official proceeding."  JA 1130.  The evidence of record was too attenuated to support the jury's verdict as to § 1512(c)(1).

---

[6] According to Harrell of First ACH, First ACH would occasionally send email to its customers.  JA 290.  However, Harrell did not testify as to any specific emails First ACH sent to "jamesfisherconsulting@gmail.com."  *See* JA 290-91.

**B.** **The evidence purporting to establish that it was Mr. Gadsden who deleted the accounts was insufficient to find this fact beyond a reasonable doubt.**

To prove evidence tampering, the government must obviously prove that Mr. Gadsden did the evidence tampering (or instructed someone else to accomplish it). But the government could never prove throughout its evidence that Mr. Gadsden was the exclusive user of these accounts. Phillips testified that according to HABC's records, Mr. Gadsden's email address was "daregadsden@gmail.com" — *not* "darengadsden@gmail.com." JA 199; JA 1613. Lynch gave no testimony regarding whether he sought any subscriber information from Google on the "daregadsden@gmail.com" account. Hubbard gave no testimony on this point either. Hubbard did testify that "IP addresses can be resolved to a specific location by the Internet service provider, such as Comcast or AT&T or whoever owns that particular IP address can resolve that -- can resolve that address to a device and/or a customer." JA 555. But Hubbard further testified that no one from the FBI, U.S. Attorney's Office, or other law enforcement agency requested that Google provide the geographical locations associated with the IP addresses.[7] Between Hubbard's testimony and that of the next witness, a brief bench conference was held on the record and defense counsel requested that the government provide geographical location information for the 66.250.191.192 IP address that was the sole common

---

[7] Even if it had been requested, Hubbard testified that Google could not provide that service. JA 555.

address among the "darengadsden," "jamesfisherconsulting," and "dkgcredit1" Gmail addresses.  JA 556-57.  The government indicated it did not plan to introduce such information.  *Id.*  Ultimately, the government relied on exhibits 107, 108, and 109 to support the inference that one person at one IP address deleted the two accounts while also having access to the "darengadsden" account.  But these records could not bridge the gap to the only email address linked to Mr. Gadsden by more than the user ID itself, that is, the "daregadsden" address provided to HABC.

In short, the jury was left to speculate that one defendant, in a multi-defendant conspiracy, was the sole user of the deleted email accounts, and that this defendant personally deleted the accounts.  Again, "no matter how generously [this Court] indulge[s] the available *reasonable* inferences in favor of the Government," reading Phillips' testimony together with Lynch's, Lyle's, and Hubbard's testimony to establish that it was *Mr. Gadsden* who deleted the "jamesfisherconsulting" and "dkgcredit1" accounts simply "require[s] reasoning so attenuated as to provide insufficient support for the jury's verdict."  *Hickman*, 626 F.3d at 764 (emphasis in original).  The verdict as to Counts 12-13 should be vacated.

**IV.  Because the district court imposed an unreasonable sentence based on the erroneous application of four adjustments in calculating Mr. Gadsden's total offense level under the Guidelines, in the event his conviction is not vacated, this case should be remanded to the district court for resentencing.**

*Standard of Review*

On a challenge to the reasonableness of a sentence, this Court's review is for abuse of discretion.  *United States v. McManus*, 734 F.3d 315, 317 (4th Cir. 2013) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).  First, the Court assesses whether the district court committed any significant procedural error, such as "failing to calculate (or improperly calculating) the Guidelines range, . . . failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  *Gall*, 552 U.S. at 51 (quoted in *United States v. Cobler*, 748 F.3d 570, 581 (4th Cir. 2014)).  The Court then evaluates the substantive reasonableness of the sentence based on the totality of the circumstances.  *Id.*

The government must have shown the applicability of any enhancement by a preponderance of the evidence.  *See*, *e.g.*, *United States v. Steffen*, 741 F.3d 411, 413 (4th Cir. 2013).  The district court's findings of fact are reviewed for clear error and any questions of law are reviewed *de novo*.  *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  A clear error occurs where this Court is left with a firm and definite conviction that a mistake has been committed.  *United States v.*

*Dugger*, 485 F.3d 236, 239 (4th Cir. 2007). "Where a Guidelines application involves a mixed question of law and fact, the applicable standard turns on the nature of the circumstances at issue. If the application is 'essentially factual,'" the Court "appl[ies] the clearly erroneous standard." *Adepoju*, 756 F.3d at 256 (quoting *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989) (citation omitted)).

### *Argument*

Through counsel, Mr. Gadsden objected to the application of each of the four Guidelines discussed below. JA 1301, 1304-06, 1309-14, 1316-17. The district court overruled the objections, gave its reasons for ordering a within-Guidelines sentence, and concluded by agreeing, in response to the government's inquiry, that the district court would have reached the same result "under an independent analysis" of the § 3553 sentencing factors. JA 1343-44. Yet the application of each enhancement was clearly erroneous. Their collective application resulted in an eight-level increase in the total offense level, ratcheting up the Guidelines sentencing range from 108-135 months to 262-327 months. That the enhancements *more than doubled* the range severely undermines the likelihood that the district court would have imposed such a significant upward variance without a more fulsome explanation of its reasoning and particularized application of the § 3553 factors. *See* JA 1331-32 (argument of counsel regarding sentencing

disparity between Brown and Mr. Gadsden); JA 1340 (statement by district court

that "these are the kinds of crimes that are suitable for guidelines resolution

because they benefit from an attempt at least in uniformity, and such an attempt is,

I guess, inherent in the guidelines").

The sentence was unreasonable.

**A.      The district court's application of the enhancement for allegedly making a misrepresentation to "obtain a benefit on behalf of" HABC was clearly erroneous.**

Guideline § 2B1.1(b)(9)(A) applies where the offense involved "a

misrepresentation that the defendant was acting on behalf of . . . a government

agency."  The enhancement requires a showing that the defendant purported to act

to obtain a benefit on behalf of a government agency "when, in fact, the defendant

intended to divert all or part of that benefit (e.g. for the defendant's personal

gain)."  U.S.S.G. § 2B1.1(b)(9)(A) n.8.  Each of the three examples provided in the

application note involve a *solicitation* to induce a third party to part with its funds,

purportedly in order that those funds would benefit a charitable or other institution

or government agency, thereby abusing the public trust.  *See id.*; *see United States

v. Frazier*, 53 F.3d 1105, 1113 (10th Cir. 1995); *see also United States v.

Achiekwelu*, 112 F.3d 747 (4th Cir. 1997).  The misrepresentation that Daughtry

LLC was entitled to *bill* HABC for services provided, on the other hand, is

distinguishable.  There was no solicitation aimed at the public trust; rather, the

alleged misrepresentation was commercial in nature, of a kind that is made an

uncountable number of times a day to banks in the ordinary course, that a business

is entitled to be paid under a contract. No one was induced to part with their own

funds on the basis that the *funds* would somehow benefit the mission of a

government agency. Concluding that Daughtry LLC purported to act *on behalf of*

HABC by billing it through ACH debits stretches far beyond the language of the

guideline and its illustrations. Therefore, it was clearly erroneous to apply this

enhancement as a matter of law.

> **B.** **The government failed to show that Mr. Gadsden used sophisticated means beyond the concealment inherent in bank fraud.**

"Whether a defendant's conduct involved sophisticated means is an

essentially factual inquiry" that this Court reviews "for clear error." *Adepoju*, 756

F.3d at 257 (citations omitted). A two-level enhancement is required where a

defendant uses sophisticated means in committing acts of fraud. U.S.S.G.

§ 2B1.1(b)(10)(C). "'Sophisticated means' means especially complex or

especially intricate offense conduct, pertaining to the execution or concealment of

an offense . . . . Conduct such as hiding assets or transactions, or both, through the

use of fictitious entities . . . also ordinarily indicates sophisticated means." *Id.*

§ 2B1.1 cmt. n.9(B). "The enhancement applies where the entirety of a scheme

constitutes sophisticated means, even if every individual action is not

sophisticated." *Adepoju*, 756 F.3d at 257. "Even so, sophistication requires more than the concealment or complexities inherent in fraud." *Id.* (citing *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012)). "[F]raud per se is inadequate for demonstrating the complexity required for enhancement." *Id.*

In *Adepoju*, the defendant was convicted of two counts of bank fraud and one of aggravated identity theft. *Id.* at 252. Adepoju sought to open fictitious individual and business checking accounts using stolen identifying information and IRS documentation for T.A. *Id.* at 252-53. He then sought to deposit two fabricated checks drawn on federally-insured banks into these accounts. *Id.* at 253. The district court applied the sophisticated means sentencing enhancement on the basis that acquiring T.A.'s personal information and opening the accounts required a level of special training. *Id.* at 254. This Court, in an opinion by Circuit Judge Gregory, vacated the sentence and remanded for resentencing. *Id.* at 259. The Court observed that "[t]he presence of forgeries or stolen identification, and a plan to use such material to wrongfully acquire moneys, does not necessarily amount to sophistication." *Id.* Rather, the enhancement requires sufficient proof that "the planned conduct was especially complex or intricate above and beyond typical § 1344 violations," which necessarily involves "more than the forgeries, misrepresentation, and concealment inherent in bank fraud." *Id.* at 257.

In this case, as in *Adepoju*, the district court committed the same tautological error. Setting up fictitious companies and accounts using information obtained through identity theft is a typical means of concealment of identity. The use of many netSpend debit cards to facilitate the withdrawals from PNC and the "burner phones" may have increased the complexity of the evidence but does not in itself establish sophistication in carrying out the alleged scheme. There was no showing that Mr. Gadsden or any of the conspirators had special skills enabling them, for example, to hack into the ACH system to bypass an ACH block, or to use the "burner phones" in a manner to prevent the cell site data from being collected and analyzed. Mr. Gadsden respectfully submits that if this Court upholds his convictions for bank fraud and conspiracy, then because the means of carrying out the fraud was essentially the same as that in *Adepoju* (albeit more successful), the sophisticated means enhancement should not be applied.

C. **The government failed to show that Mr. Gadsden individually derived more than $1,000,000 in gross receipts as a result of the fraud on HABC.**

Guideline § 2B1.1(b)(16)(A) — formerly § 2B1.1(b)(15)(A) — provides for a two-point sentence enhancement where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." This enhancement requires the government to prove that "the gross receipts to the defendant individually, rather than to all participants, exceeded

$1,000,000." *Id.* § 2B1.1(b)(16)(A) n.12 (2013) (formerly note 10). Gross receipts include "all property . . . which is obtained directly or indirectly as a result" of the offense. *Id.*

It was the government's burden to demonstrate by a preponderance of the evidence the grounds for this enhancement to apply. *See United States v. Colton*, 231 F.3d 890, 912 (4th Cir. 2000). That burden can be satisfied by, for example, the testimony of an agent that he calculated gross receipts attributable to the individual defendant by examining bank records, receipts, and other documents collected during the investigation of the case. *E.g.*, *United States v. Knox*, 624 F.3d 865, 873 (7th Cir. 2010). The government presented the district court with no such calculation here. Instead, it simply presented the bare conclusion that Mr. Gadsden should have declared "nearly $1.4 million in illicit income" to the IRS for 2010. JA 1387. This bald statement, in the context of a multiparty conspiracy in which the gross receipts to all participants was "nearly $1.4 million," is clearly contrary to the requirement that gross receipts be proven as to each party individually. *See* U.S.S.G. § 2B1.1(b)(16)(A) n.12.

Furthermore, it was wholly contrary to the record evidence regarding the manner in which the co-conspirators shared the proceeds. For example, Brown testified that Mr. Gadsden received a one-third share of the withdrawals she or her recruits made at the ACE Cash Express stores. JA 582-83. Brown also controlled

the Daughtry netSpend card, JA 585, which received $73,700 in proceeds, JA 334-46, 1795-96, and the Lydia Reid netSpend card, JA 612, which received $28,800, JA 1795-96.  Out of a total of $703,950.30 transferred out of Daughtry LLC and onto netSpend cards, the government's evidence showed that at most Mr. Gadsden received $261,016 (the sum of the amounts transferred to the M.G. and J.F. debit cards plus one third of the remainder) in this way.  This sum, of course, falls far short of the $1,000,000 threshold.  Even assuming that the government could show by a preponderance of the evidence (which it did not) that Mr. Gadsden individually derived all of the gross proceeds transferred from the Daughtry LLC account to the Fisher LLC account ($255,402), JA 1464-65, the total still falls short by nearly half (only $561,418).  Moreover, there was no adequate showing that Mr. Gadsden maintained such control over Daughtry LLC that 100% of the gross receipts should be attributed to him rather than Darden (who represented himself as Daughtry, a sole proprietor, to PNC) or that Mr. Gadsden enjoyed the benefits of proceeds transferred to other participants in the scheme.  *See United States v. Edelkind*, 467 F.3d 791, 800-01 (1st Cir. 2006).  The district court

therefore clearly erred in concluding that Mr. Gadsden warranted this sentence enhancement.[8]

## D. The district court's application of the enhancement for obstruction of justice was clearly erroneous.

Without conceding that Mr. Gadsden's conviction on Counts 12-13 should stand, if this Court upholds the jury's verdict, the sentence enhancement pursuant to Guideline § 3C1.1 still should be vacated. Per Application Note 7, § 3C1.1 "is not to be applied to the offense level" for an offense covered by § 2J1.2 "except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." Guideline § 2J1.2 covers offenses under 18 U.S.C. § 1512. Mr. Gadsden does not concede that § 2J1.2 should be applied, but in any event, it was clear procedural error for § 3C1.1 to have been applied to enhance his sentence.

---

[8] The government similarly failed to prove the amount of restitution by a preponderance of the evidence. The district court ordered restitution in the amount of $1,399,700 to PNC as the victim. JA 1342, 1350. But the trial testimony and the final PSR indicated that PNC's loss was $1.1 million. JA 188, 1423. There was no additional evidence to establish that PNC, the Housing Authority, or anyone else is owed an additional $299,700. Moreover, the district court ordered *each* defendant to pay the full amount of the restitution, without an individualized consideration. Accordingly, it was plain error for the district court to order Mr. Gadsden to pay the full amount of $1,399,700 in restitution.

## CONCLUSION

In consideration of the foregoing arguments, Mr. Gadsden submits that the Court must vacate the jury's verdict and direct the entry of judgment of acquittal as to all counts based on insufficient evidence. In the event the jury's verdict is upheld, however, this Court should vacate Mr. Gadsden's sentence and the case remanded for resentencing based on a total offense level of not more than 29.

## STATEMENT REGARDING ORAL ARGUMENT

In view of the issues presented by the Supreme Court's intervening decision in *Loughrin v. United States*, 134 S. Ct. 2384 (U.S. June 23, 2014), the paucity of evidence supporting the evidence tampering counts, and the unlikelihood that the district court would have departed from the Sentencing Guidelines had the enhancements not applied, Mr. Gadsden respectfully submits that oral argument would assist the Court in its review of this appeal. Accordingly, Mr. Gadsden requests this Court to grant oral argument.

Respectfully submitted,

/s/ Steven H. Levin
Steven H. Levin
Sarah F. Lacey (*on the brief*)
LEVIN & CURLETT LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
(410) 685-0078

# CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

     [ X ] this brief contains [*11,376*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

     [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

     [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: August 28, 2014                    /s/ Steven H. Levin
                                          *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 28th day of August, 2014, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Sujit Raman
> OFFICE OF THE U.S. ATTORNEY
> 6500 Cherrywood Lane, Suite 200
> Greenbelt, Maryland 20770
> (301) 344-4432
>
> *Counsel for Appellee*

I further certify that on this 28th day of August, 2014 I caused the required

copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk

of the Court and a copy of the Sealed Volume of the Joint Appendix to be served,

via UPS Ground Transportation, upon counsel for the Appellee, at the above

addresses.

/s/ Steven H. Levin
*Counsel for Appellant*